[No. B023646. Second Dist., Div. Four. Nov. 20, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL STEVEN JENKINS, Defendant and Appellant.

[No. B029977. Second Dist., Div. Four. Nov. 20, 1987.]

In re DANIEL STEVEN JENKINS on Habeas Corpus.

COUNSEL

Howard R. Price, under appointment by the Court of Appeal, for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Thomas L. Willhite, Jr., and John A. O'Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS, P. J.**—In this appeal of a conviction for robbery and assault with a deadly weapon, appellant Daniel Steven Jenkins raises several issues arising from the much-publicized ambush killing of a prosecution witness, the police investigating officer, during the jury deliberations. He contends that: (1) the trial court should have questioned the jurors individually regarding the effect on them of their knowledge of the killing; (2) his motion to disqualify the trial court judge should have been granted; and (3) it was error to deny his motion to recuse the entire branch office of the district attorney.

In addition, appellant argues that his sentence for both robbery and assault with a deadly weapon violates the double punishment proscription of Penal Code section 654;[1] the trial court erred in failing to instruct on which act of shooting constituted the violation of section 245, subdivision (a); and the prosecutor committed prejudicial misconduct in her final argument to the jury.

Appellant has also filed a petition for writ of habeas corpus which contains facts regarding his first issue on appeal. We previously deferred consideration of the petition pending determination of the appeal.

Appellant was charged by information with one count of robbery and one count of assault with intent to commit great bodily injury and with a deadly weapon. (§§ 211, 245, subd. (a).) It was further alleged that he personally used a firearm (§§ 12022.5, 1203.06, subd. (a)(1)) and had two prior convictions, for receiving stolen property and assault with a deadly weapon (§§ 496, 245, subd. (a), 1203, subd. (e)(4)).

At the beginning of the trial, the jury received preliminary instructions which included an advisement to decide the case solely on the basis of the evidence heard in the courtroom.

The evidence at trial showed that around 12:45 a.m. on October 14, 1984, George Carpenter and James Bruceri went to the night depository window of a North Hollywood bank to deposit their employer's receipts. Carpenter left the car to open the night depository; Bruceri remained in the car with the money. Appellant got out of a nearby parked car, pointed a handgun at Carpenter's head, and demanded the money.

Carpenter, hands in the air, said he did not have the money. A voice from behind the wheel of the parked car stated, "Shoot the mother fucker" or

---

[1] All code references are to the Penal Code unless otherwise noted.

"kill both of them." Carpenter hastily said, "Wait a minute. The money is in the car. You can have the money."

Appellant fired a shot at Carpenter, but did not hit him. Carpenter instructed Bruceri to throw the money from the car. Bruceri complied, and appellant picked it up. The voice from the car said, "Shoot the mother fucker anyway." Appellant fired another shot, which again did not strike Carpenter. Appellant, who limped, walked back to the parked car which drove away.

Carpenter and Bruceri immediately made a police report which described appellant and included a description of the car. They both unequivocally identified appellant at the trial.

Two weeks later, appellant was arrested following a stop for a traffic violation.

Appellant and three of his friends testified that he was at a party at the time of the crime. Appellant claimed a friend named Anthony Penn, who was then in jail, told him he had used appellant's car to commit the robbery. Appellant testified that he told this to Detective Williams, the investigating officer. In rebuttal, Detective Williams testified that appellant never told him anything about Anthony Penn.

Following Williams's testimony on October 31, 1985, the case was argued and the jury instructed. The jury left the courtroom at the end of the day with the understanding that it was to begin its deliberations the next morning and was "not to do any research on any subject connected with this crime."

At 9:20 a.m. the next morning, counsel for both sides met with the trial court in chambers to discuss a question from the jury which stated: "The jury is aware of the murder of Detective Williams late yesterday afternoon. We do not feel we would be influenced in any way in our deliberations, however, will our knowledge of this murder have any effect on the validity of our decision."

Defense counsel explained that there had been extensive news coverage of the shooting death of Detective Williams, who had been ambushed while picking up his five-year-old son at a day care center. Counsel moved for a mistrial on the ground an event of that magnitude would necessarily influence the outcome of the case. He further requested that the jurors be individually questioned about the problem. The prosecutor (a different deputy district attorney than had conducted the trial) proposed that the jury

should simply be instructed not to consider anything which might have been overheard on the news, and asked if any juror had a problem complying with that instruction. He argued that to call the jurors into chambers separately might place undue weight on the shooting and create an inference that it was related to appellant's case.

The trial court agreed with the deputy district attorney on the need to avoid drawing further attention to the problem, and saw no need for individual questioning because the jury note indicated that the jurors as a whole ("we") did not feel their deliberations would be influenced. The court decided to ask the jurors as a group if they could follow the instruction and to rule on the mistrial motion after hearing the jury's response.

The jurors were brought into the courtroom and the trial court addressed them as follows:

"[THE COURT:] Ladies and gentlemen, I felt that it would be best to have you assembled in court in response to this question. I want to again remind you of the instructions that were given to you yesterday, and even previously to that, that you are not to consider anything that you may have heard, read or seen in any news media, including the television, that you are only to consider the evidence that was presented in this court from the witness stand. And that you shall not consider anything that you may have heard from any other source, and that you are to base your decision solely on that.

"Now, is there anyone on the jury that feels they would not be able to follow that instruction?

"(No audible response.)

"THE COURT: Based on that, ladies and gentlemen, I want to again remind you that it is essential that you only consider that evidence and that you disregard anything that you have heard from any other source whatsoever involving the circumstances that may have been heard or seen in the paper concerning your question regarding Detective Williams.

"So with that, ladies and gentlemen, I wish you to continue in your deliberations."

The jury thereupon retired, deliberated one and one-half hours, and found appellant guilty as charged. The prosecutor then moved that appellant, who had been out on bail, be remanded without bail. He argued that a prison sentence was likely and there was reason to believe appellant was connected both to Detective Williams's killing and to an assault with a

firearm upon Mr. Carpenter, the robbery victim, which had occurred for no apparent reason between the time of the preliminary hearing and the trial. Appellant was remanded without bail.

Several days later, the trial court found the prior convictions to be true.

A motion for new trial was filed by appellant's counsel, a deputy public defender. However, the public defender later moved to be relieved, due to a conflict of interest which had developed after the trial. That motion was initially denied, but was granted after the Court of Appeal issued a peremptory writ of mandate. The trial court then appointed Howard Price as appellant's counsel.

Appellant moved to disqualify the trial court judge, the Honorable Bruce J. Sottile, and to recuse the district attorney's office. He also filed a lengthy motion for new trial. The motion to disqualify Judge Sottile was denied in proceedings before the Honorable Aurelio Munoz. Judge Sottile denied the motions for recusal and for new trial. Appellant was sentenced to eight years in state prison, based upon the upper term of five years for robbery, a one-year consecutive sentence for the assault with a deadly weapon count, and two years for the firearms use. This appeal followed. We affirm the conviction.

## I

Appellant contends that the trial court should have questioned the jurors individually on their ability to be impartial in view of their knowledge of the killing of Detective Williams.

Appellant attached a declaration to his motion for new trial. He declared that if called upon he would testify to the following increased security precautions in the courtroom on November 1, 1985: that he was searched by one of the bailiffs as he entered the courtroom, but does not know whether there were any jurors in the hallway who might have observed this search; that he observed a uniformed deputy sheriff at the back of the courtroom holding a shotgun or rifle; that this sheriff was ordered out of the courtroom and appellant does not know whether this occurred before the jury entered; that he observed two individuals in casual clothes with earphones and walkie-talkies, one near the door leading from the jury box to the deliberation room and the other in the clerk's area; and that he observed a uniformed police officer and at least three uniformed deputy sheriffs in the courtroom. During the trial only one bailiff had served in the courtroom. Moreover, he observed a television camera crew outside the courtroom, and

two or three people, who appeared to him to be reporters, taking notes in the audience.

Newspaper accounts appended to the motion for new trial describe the ambush killing of Detective Williams, but do not mention appellant or the trial. It was reported that the police were looking at cases on which Williams was presently working or had worked in the past for possible leads.

Respondent maintains that the alleged facts regarding increased courtroom security may not be considered on appeal because they do not appear in the record of that day's proceedings. Appellant argues that the facts are properly shown through the declaration for the new trial motion, and were uncontested at the oral proceedings on the motion. As a protective measure, appellant has filed a petition for writ of habeas corpus which contains an identical declaration. Since respondent could have and did not contest these facts below, they may properly be considered on appeal.

■ It is axiomatic that a jury's verdict must be based solely on evidence received in open court. (*Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 351 [16 L.Ed.2d 600, 613-614, 86 S.Ct. 1507].) Jurors' reading of newspaper accounts related to the trial proceedings creates a presumption of prejudice which the People must rebut. (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].)

■ In our view, the facts here necessarily created a presumption of prejudice. The jurors became aware of the killing of Detective Williams. The killing occurred in the evening of the day he testified at appellant's trial. On November 1, 1985, the following day, there was a drastic change in courtroom security. In addition, the wording of the jurors' note showed that they had discussed the news reports among themselves. The question is whether the presumption of prejudice was rebutted. We conclude that it was.

At the time the jurors were exposed to the media reports, they had already been warned not to consider anything but the evidence presented at trial. The jury note indicates that all of the jurors ("we") understood that the news was not to affect their deliberations. They indicated in open court that they could follow the instructions and not consider anything other than the evidence.[2] This affirmation, and the fact that the news stories did not

[2] Evidence Code section 1150, subdivision (a) precludes an inquiry into the thought processes of jurors which led to their verdict. (*In re Stankewitz* (1985) 40 Cal.3d 391, 397, 402 [220 Cal.Rptr. 382, 708 P.2d 1260].) It does not prohibit asking jurors before a verdict is reached whether certain misconduct will color their deliberations.

link appellant in any way to the killing, causes us to conclude that the jurors did exactly what they were sworn to do.

■ The security measures taken in the courtroom were justified by the fact that one witness had been shot at and another had been killed. We cannot say without other evidence that the security affected the verdict. We conclude that it did not.

Further, the authorities cited by appellant do not support the proposition that the trial court was required to question the jurors individually.

In *People v. Guzman* (1977) 66 Cal.App.3d 549, 560 [136 Cal.Rptr. 163], the trial court improperly permitted jury deliberations to continue without investigating the possibility that a juror had proposed bartering a verdict between the two defendants. The court later conducted an improper inquiry as it included only some of the jurors. Here, in contrast, the trial court responded immediately to the problem, and gave all of the jurors an opportunity to indicate whether they could follow the instructions.

*People* v. *Pierce* (1979) 24 Cal.3d 199, 206 [155 Cal.Rptr. 657, 595 P.2d 91], is also distinguishable. The court there found that the trial court should have conducted an evidentiary hearing based on reports which indicated that the jury foreman had discussed the case with a friend who was a police officer witness. There are no comparable allegations involved in this case. Here, the jury read an article about a witness being slain. The article made no reference to this trial.

■ Appellant seeks reversal relying on the rule that, where visible restraints are imposed on a defendant in the courtroom, the trial court must instruct the jury sua sponte that the restraints are to have no bearing on the determination of guilt. (*People* v. *Duran* (1976) 16 Cal.3d 282, 291-292 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) We see no equivalent sua sponte duty to instruct regarding the increase in courtroom security in this case. Such an instruction would seem to have been appropriate upon request, but the court had no obligation to instruct on its own initiative. There is no reversible error as there is no evidence that the verdict was affected by the security.

We further find no reversible error in the trial court's failure to question the jurors individually nor in the fact that security measures were taken.

## II

Appellant's next argument is that his motion to disqualify Judge Sottile on the ground of personal knowledge and bias (Code Civ. Proc., § 170.1,

subds. (a)(1) and (a)(6)(C))[3] should have been granted or he should have at least been given an evidentiary hearing.

The written motion for disqualification included copies of the reports of two police officers who interviewed Judge Sottile after the shooting of Detective Williams. According to the reports, Judge Sottile said he had been so "totally unnerved" by the way appellant stared at people during the trial that he had asked Detective Williams to remain nearby while the jury was instructed. In addition, two strange calls had been received at the judge's home number, which was unlisted.

In response, Judge Sottile filed a declaration in which he maintained that he was not biased against appellant and that to remove judges from cases whenever they were threatened would encourage defendants to forum shop by threatening judges.

Appellant also argued that Judge Sottile was biased because, at the hearing where the public defender sought to be relieved due to a conflict of interest, the judge refused to hear argument from Mr. Price, the attorney who had been appointed to represent appellant at the Williams murder trial and is counsel on this appeal.

At the hearing on the motion to disqualify Judge Sottile, Judge Munoz heard lengthy argument but refused to hold an evidentiary hearing. The motion was denied.

■ Appellant unsuccessfully sought review of the disqualification ruling by writ, and now raises it on appeal. Respondent argues that this issue is not cognizable on appeal due to section 170.3, subdivision (d) of the Code of Civil Procedure, which states: "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought within 10 days of notice to the parties of the decision and only by the parties to the proceeding." We find no reported cases which analyze this point, but clearly respondent's position is correct.

The unambiguous language of the statute indicates that an order determining disqualification is reviewable "only" by writ, thereby precluding review on appeal from a judgment. The Legislature obviously opted for

---

[3]Section 170.1, subdivision (a) provides in pertinent part: "(a) A judge shall be disqualified if any one or more of the following is true: [¶] (1) The judge has personal knowledge of disputed evidentiary facts concerning the proceeding. . . . [¶] (6) For any reason . . . (C) a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial. . . ."

speedy review of a disqualification ruling, since permitting that ruling to be attacked later on appeal of the judgment could invalidate every ruling made by the trial court judge after the disqualification motion was denied.

The available legislative history supports the exclusivity of the writ remedy.

Section 170.3, subdivision (d) was enacted as part of the overhaul of the system of challenging judges for cause which occurred in 1984 through enactment of Senate Bill No. 1633 (Stats. 1984, ch. 1555, § 7). A virtually identical provision was contained in an unsuccessful predecessor bill, Senate Bill No. 598. Detailed analysis of Senate Bill No. 598 was provided to the Senate Judiciary Committee by Professor Preble Stolz, chair of the State Bar committee which drafted the legislation. Page 15 of that analysis, which has been furnished to us by the Legislative Intent Service, states: "Exclusive review by writ of mandate is intended to provide as speedy an appellate determination as possible while still permitting evolution of stand- ards through case-by-case adjudication."

Appellant cites *People* v. *Nathan* (Cal.App. Mar. 12, 1987) C000007, which has since been depublished. Other cases cited by appellant do not involve statutes specifying exclusive writ review. (See, e.g., *People* v. *Wilson* (1963) 60 Cal.2d 139, 150-154 [32 Cal.Rptr. 44, 383 P.2d 452] [speedy trial]; *People* v. *Pompa-Ortiz* (1981) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941] [nonjurisdictional irregularities in preliminary examination procedures].)

*Garcia* v. *Superior Court* (1984) 156 Cal.App.3d 670, 679 [203 Cal.Rptr. 290], does state: "Assuming the denial of a motion to disqualify the trial judge, the party who has so moved may raise the issue of the alleged wrongful denial of the motion to disqualify in an appeal from an unfavorable judgment." The authority cited by *Garcia* is the second edition of Witkin on California Procedure. However, the third edition recognizes that the former rule permitting review on appeal was changed by enactment of section 170.3, subdivision (d). (2 Witkin, Cal. Procedure (3d ed. 1985) Courts, § 109, pp. 126-129.)[4] The statement in *Garcia* is therefore no longer valid.

The issue regarding disqualification of Judge Sottile is not cognizable on appeal. Additionally, the grounds raised in the motion to disqualify were insufficient to justify an evidentiary hearing.

---

[4] Witkin, third edition, is not consistent on this point. The "Appeal" chapter, which relies on pre-1984 case law, states that an order denying a motion to disqualify a judge is a nonappealable order which is reviewable on appeal from the judgment itself. (9 Witkin, Cal. Procedure, *supra*, Appeal, § 88, p. 109.) The "Courts" chapter cited in the body of this opinion sets forth the correct statement of the current law.

## III

■ Appellant next contends that his motion to recuse the entire branch office of the district attorney should have been granted.

The motion for recusal argued that Maureen Duffy-Lewis, the deputy district attorney who had conducted the trial, could no longer be impartial. Ms. Duffy-Lewis told the police that on October 31, 1985, while she was in the courtroom with Detective Williams during appellant's trial, Williams turned to her and said, "We are dead." Both Judge Sottile and Ms. Duffy-Lewis received 24-hour armed guards after Williams's killing. On January 3, 1986, Ms. Duffy-Lewis received a letter with appellant's name typed on it which indicated that the "Jenkins gang" would kidnap her daughter if she opposed a new trial for appellant. Moreover, at proceedings on January 15, 1986, Ms. Duffy-Lewis had said to appellant's counsel, after seeing him put his hand on appellant's shoulder, "How can you touch him?!" Appellant further argued that the entire branch office of the district attorney should be disqualified as Ms. Duffy-Lewis has probably communicated her emotional reaction to her coworkers.

The motion for recusal was heard on the date of the sentencing hearing. Mr. Barshop, the head of the branch office, indicated that he was appearing for Ms. Duffy-Lewis out of an abundance of caution, but was not conceding that there were grounds for recusing her. The trial court denied an evidentiary hearing and ruled that the motion for recusal was moot as to Ms. Duffy-Lewis and should be denied as to the branch office.

We see no error in the trial court's rulings. Ms. Duffy-Lewis was no longer on the case, and there was no basis for taking evidence or recusing the office. Given the late stage of the proceedings, there was very little prosecutorial discretion remaining to be exercised. Moreover, there is absolutely no indication of any impropriety at the sentencing hearing. The probation report listed numerous aggravating and no mitigating circumstances and appellant's counsel recognized that only "a madman" would argue against imposition of the upper term.

## IV

■ Appellant was sentenced consecutively on count I (robbery) and count II (assault with a deadly weapon). He contends that count II should have been stayed pursuant to section 654's proscription against multiple punishment.

The facts show that appellant fired one shot at Carpenter before he got the money and another after he picked the money up.

Appellant contends that both shots were fired with the same objective, to facilitate the robbery. We disagree. The second shot was completely unnecessary to the robbery, and appears to have been a gratuitous act of violence. The separate sentences were appropriate.

V

Appellant next contends that the trial court should have instructed the jurors that they had to agree unanimously on which act of shooting constituted the assault with a deadly weapon. Assuming arguendo that such an instruction should have been given, there was no possible prejudice. The jurors had to decide whether appellant fired both shots, or neither shot. There was no rational basis for distinguishing between the two shots. (See *People* v. *Deletto* (1983) 147 Cal.App.3d 458, 473 [195 Cal.Rptr. 233].)

VI

■ Finally, appellant maintains that the prosecutor committed misconduct in her closing argument by indicating that if she seemed sarcastic towards the defense witnesses, it was because her job made her privy to the facts of the case so she knew whether a witness was lying. Although the isolated statement was improper, the issue is not cognizable on appeal because no objection was made and a timely admonition would have cured the harm. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) Also, the statement was followed by a reminder to consider only the "evidence from the witness box."

The judgment is affirmed. The petition for writ of habeas corpus is denied.

McClosky, J., and George, J., concurred.

A petition for a rehearing was denied December 11, 1987, and appellant's petition for review by the Supreme Court was denied March 17, 1988. Mosk, J., was of the opinion that the petition should be granted.